IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| FENYANG STEWART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-cv-1369 (LMB/TCB) |
| | ) | 1:16-cv-213 (LMB/JFA) |
| WILBUR L. ROSS, JR., Secretary, U.S. | ) | |
| Department of Commerce, et al. | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

In these consolidated civil actions brought against defendants Wilbur Ross and Andre

Iancu (collectively, "defendants"), in their respective capacities as the Secretary of the U.S.

Department of Commerce ("USDOC") and the Director of the U.S. Patent and Trademark Office

("USPTO"), plaintiff pro se Fenyang Stewart ("plaintiff" or "Stewart") challenges multiple

mixed case decisions of the Merit Systems Protection Board ("MSPB") and the Equal

Employment Opportunity Commission ("EEOC"), including the affirmance of his removal from

employment with the USPTO.[1] Before the Court are defendants' Motion to Dismiss in Part and

Motion for Summary Judgment in Part, as well as plaintiff's Cross-Motion for Summary

Judgment. For the reasons that follow, defendants' Motion to Dismiss in Part and Motion for

---

[1] "A mixed case appeal is an appeal filed with the MSPB that alleges an appealable agency action was effected, in whole or in part, because of discrimination." Zachariasiewicz v. U.S. Dep't of Justice, 395 F. Supp. 3d 734, 738 (E.D. Va. 2019). "Normally, an employee alleging unlawful employment actions by an agency must split his claims into separate actions before different administrative entities depending on the allegations." Id. "A mixed case appeal is, in essence, a hybrid action allowing an employee to streamline his case by bundling his claims into one proceeding before the MSPB." Id. Once the MSPB issues its decision, an employee can petition the EEOC to review the decision only with respect to the discrimination claims. Luther v. Gutierrez, 618 F. Supp. 2d 483, 489–90 (E.D. Va. 2009). Once the EEOC issues its decision, an employee can seek review of both decisions in the appropriate federal district court. Id.

Summary Judgment will be granted, and plaintiff's Cross-Motion for Summary Judgment will be denied.

## I. BACKGROUND

### A. <u>Factual Background</u>[2]

Plaintiff was employed by the USPTO as a patent examiner from September 2013 to September 2016. Amended Consolidated Complaint ("Complaint") [Dkt. 53][3] ¶¶ 16, 47. Over the course of his employment, plaintiff submitted numerous requests for accommodations under the Rehabilitation Act to the USPTO's Office of Equal Employment Opportunity and Diversity ("OEEOD"). See, e.g. id. ¶¶ 50, 64. Virtually all of the issues in these consolidated actions concern plaintiff's accommodation requests. Primarily, the issues concern plaintiff's repeated requests (1) to have all meetings with his supervisor occur in the afternoon due to a pinched nerve in his back, the medication for which "caused loss of concentration" in the morning, and (2) to be transferred to work under a different supervisor due to post- and continuous- traumatic stress disorder "stemming from physical abuse in [his] childhood," which was "triggered" and "exacerbated" by interactions with his then-supervisor Ken Lo. See, e.g., id. ¶¶ 72–74, 78, 87, 98, 104, 110, 117–18, 121, 123, 131, 138, 141, 151, 154, 161, 163, 170, 179, 181, 190, 199, 202, 255, 262, 266, 269.

---

[2] Plaintiff's 127-page and 21-count Amended Consolidated Complaint, which is his fifth complaint between these two consolidated actions, includes many inconsistent and at times incomprehensible allegations. Such "length[y] and confusing" pleading has "burdened the Court with fishing through the [complaint] to reconcile its extensive factual allegations with the various causes of action," a task which other courts have "decline[d] to undertake," opting instead to dismiss the complaint outright. Negron-Bennett v. McCandless, 2013 WL 5552236, at *4 (E.D. Va. Oct. 3, 2013). Nevertheless, "in accordance with the liberal construction [the Court] afford[s] a pro se complainant," the Court will construe plaintiff's complaint "as best [it] can given the thrust of [his] [allegations]." Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 72 (4th Cir. 2016).

[3] Unless otherwise indicated, docket citations are to the docket in case number 18-cv-1369.

On July 30, 2014, plaintiff submitted a request for seven accommodations based on his diagnosis of a pinched nerve in his back, "which prevented him from sitting for long periods of time and, at certain times, standing for long periods of time," and the medication for which "caused loss of concentration" in the morning. See, e.g. id. ¶ 98. Specifically, plaintiff requested: (1) "[t]o not be required to come into work at a certain time;" (2) "[t]o not be required to report to his supervisor his upcoming work schedule for the week/biweek;" (3) "[a]n ergonomic chair;" (4) "[a]n ergonomic keyboard;" (5) "[t]o have meetings, interviews and mentoring sessions occur in the afternoon, after 12:00 pm;" (6) "[a] standing, height-adjustable desk;" and (7) "[a] foot stool." [MSPB Record, Dkt. 16-7, at 151–53].[4] On September 19, 2014, the USPTO issued a two-page written decision regarding plaintiff's requests, which was broken into five numbered parts as follows. Id.

In parts 1 and 2, respectively, the decision listed plaintiff's name and his seven requested accommodations. Id. In part 3, entitled "Accommodation Granted," the decision stated:

> [Plaintiff] is granted an ergonomic keyboard, a standing desk, and a footstool. [Plaintiff] should contact the USPTO helpdesk to arrange for his request for an ergonomic keyboard. Given that [plaintiff] has [already] received an ergonomic chair, [plaintiff's] request for an ergonomic chair is moot.
>
> With respect to request number 1, [plaintiff] is currently on an IFP work schedule,[5] which should allow him sufficient flexibility in his schedule to work around any difficulties he encounters with adhering to his typical work schedule.

---

[4] Unless otherwise indicated, where the MSPB record is cited, it can be considered in resolving defendants' partial motion to dismiss as well as the parties' cross-motions for partial summary judgment. "The Court may look to documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion [to dismiss] into a Rule 56 motion for summary judgment." Healey v. Abadie, 143 F. Supp. 3d 397, 401 (E.D. Va. 2015). Here, plaintiff has incorporated the entire 2500-page MSPB record by reference into his complaint. See Compl. ¶ 19 ("The authenticated written multi-volume MSPB record is incorporated by reference into this complaint in its entirety . . . .").

[5] An IFP work schedule is an "Increased Flexi-time Policy" work schedule, which allowed plaintiff to work "between 5:30 a.m. and 10:00 p.m." in order to meet the requirement that he work "at least 4 days a week and 80 hours every bi-week." [MSPB Record, Dkt. 16-1, at 248].

> Consistent with the IFP program, [plaintiff] must confer with his supervisor to establish a work schedule that allows him to maximize interaction, training and mentoring with his supervisor. [Plaintiff] must notify his supervisor as soon as possible when his condition requires him to begin or end work at times that differ from his typical work schedule, as established by him and his supervisor.

> [Plaintiff's] supervisor and mentors will, <u>when possible</u>, schedule meetings designed specifically for [plaintiff] for times after 12:00 p.m.

<u>Id.</u> (emphasis added). In parts 4 and 5, plaintiff's requests to have meetings, interviews, and mentoring sessions occur in the afternoon and not to be required to report his upcoming work schedule were either "denied" or "partially denied" because they would cause the USPTO "undue hardship." <u>Id.</u> Specifically, part 5 explained:

> [Plaintiff's] request to not report his upcoming work schedule to his supervisor for the week/bi-week is denied. An employer is not required to provide an accommodation that would fundamentally alter the nature or operation of the business and cause the Agency undue hardship. In this instance, [plaintiff's] request would be difficult for his supervisor and the Agency to oversee and administer and is also not supported by any medical documentation suggesting that not informing his supervisor of his planned typical work schedule for the week or bi-week would alleviate any difficulties caused by his condition. Further, [plaintiff] is currently on an IFP schedule, which allows him to adjust his work schedule to meet his needs, as long as he notifies his supervisor when he deviates from his fixed work schedule. The Agency believes that this accommodation is effective in accommodating [plaintiff's] medical condition. An Agency is not required to provide the specific accommodation requested, and may choose among reasonable accommodations as long as the accommodation is effective.

> With respect to [plaintiff's] request to have interviews occur in the afternoon, [plaintiff] has the ability to schedule interviews in the afternoon on his own without needing a reasonable accommodation. As a result, [plaintiff's] request to have interviews in the afternoon can be handled outside of the reasonable accommodation process. [Plaintiff's] supervisors and mentors will, <u>when possible</u>, schedule their meetings with him after 12:00 p.m. However, it would be unreasonable to require the Agency to avoid meeting times before noon when attempting to schedule meetings that that [sic] require coordinating the schedules of multiple attendees, so the Agency cannot fully excuse [plaintiff] from being required to attend meetings before noon.

<u>Id.</u> (emphasis added).

4

On October 7, 2014, Shirlena Morgan, an employee of the USPTO's financial management office responsible for coordinating certain accommodations, emailed plaintiff regarding his requests for a standing desk and footstool. [Case No. 16-cv-213, Dkt. 11-13].[6] Morgan asked that plaintiff "[p]lease give [her] a call at [his] convenience to coordinate [his] accommodation[s]." Id. Plaintiff did not respond to Morgan's email or otherwise make any effort to coordinate implementation of his standing desk and footstool requests over the next six months. Compl. ¶ 198. Despite plaintiff's failure to respond, he subsequently received a standing desk on March 19, 2015, and received a footstool on June 2, 2015. Id. ¶¶ 51–52.

On May 30, 2015, plaintiff's supervisor Robert Fennema informed plaintiff that he was being investigated for impermissibly working hours outside of the IFP work schedule. Id. ¶ 58. Plaintiff admitted to working all of the hours at issue, but claimed he had been granted an accommodation that allowed him to work hours outside of the IFP work schedule. Id. Plaintiff's claim was not corroborated, and on June 4, 2015, following an investigation into the matter, Fennema issued plaintiff a letter of reprimand for impermissibly working hours outside of the IFP work schedule. Id. ¶ 60. As relevant here, the letter explained that plaintiff confirmed to Fennema that he was told at an IFP training session on February 27, 2015 that he could not work hours outside of the IFP work schedule. [MSPB Record, Dkt. 16-1, at 250].

Plaintiff first initiated contact with the OEEOD on April 30, 2015 and filed a formal complaint with the OEEOD on July 14, 2015. Compl. ¶¶ 11–12. In his formal complaint,

---

[6] Plaintiff filed this email in the record earlier in this litigation, and does not dispute having received it. [Case No. 16-cv-213, Dkt. 11-13]. Therefore, it can be considered in resolving defendants' partial motion to dismiss as well as the parties' cross-motions for partial summary judgment. "In deciding a [Rule 12(b)(6)] motion to dismiss, a court may consider the facts alleged on the face of the complaint as well as matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Spirito v. Peninsula Airport Comm'n, 350 F. Supp. 3d 471, 480 (E.D. Va. 2018).

plaintiff alleged at least seven instances in which "he was discriminated against in violation of the Rehabilitation Act." [MSPB Record, Dkt. 16-5, at 141–43]. These instances included (1) failure to accommodate when the USPTO denied his request to work hours outside of the IFP work schedule, (2) failure to accommodate when the USPTO failed to implement his requests for a standing desk and footstool until March 19, 2015 and June 2, 2015, respectively, (3) retaliation for engaging in EEO activity when the USPTO deemed his wife unqualified for a job vacancy, (4) retaliation for engaging in EEO activity when the USPTO did not select his wife to fill a job vacancy, (5) disability discrimination when Fennema issued him a letter of reprimand for impermissibly working hours outside of the IFP work schedule, (6) hostile work environment when the USPTO failed to accommodate him or otherwise disregarded his accommodations, and (7) disability discrimination when he was delayed a promotion. Id. Plaintiff amended his formal complaint numerous times throughout his employment with the USPTO, and in total appears to have alleged at least 37 instances in which he was purportedly discriminated against in violation of the Rehabilitation Act. Id.

On October 16, 2015, plaintiff requested that the OEEOD temporarily transfer him to a different supervisor because Fennema was engaging in an "alleged pattern of harassment" which plaintiff believed was "a form of retaliation for filing a formal [complaint] [with] the [OEEOD]." [MSPB Record, Dkt. 16-1, at 191]. The OEEOD responded that it "ha[d] no jurisdiction to order a temporary transfer" and had "forwarded [plaintiff's] request to Employee Relations." Id. at 189. On October 23, 2015, plaintiff reiterated his request "to be transferred to work under another [supervisor]" to one of his superiors, Wendy Garber. Id. Garber responded that plaintiff could "temporarily turn in cases" to Ken Lo, although Fennema would "continue to be [his] supervisor" for all other matters. Id. at 188.

Despite initially confirming to Garber that this "solution" was "satisfactory and equitable," id., only a few weeks later, on November 17, 2015, plaintiff requested that she permanently transfer him from Lo to Kakali Chaki, another supervisor with whom plaintiff had been working while Lo was out of the office. Compl. ¶¶ 64, 146. Plaintiff explained that his and Lo's "styles [did] not mesh together well at all," whereas his and Chaki's styles "mesh[ed] very well together." Id. ¶ 146. Garber responded that "since [plaintiff] had less than a week of working with [Lo] [given the time that Lo was out of the office], it [was] premature to consider another transfer." Id. ¶¶ 64, 148. Three days after Garber's response, on November 20, 2015, plaintiff again requested that she permanently transfer him to Chaki, this time characterizing the request as a request for an accommodation. [MSPB Record, Dkt. 16-5, at 333]. Garber responded that she "[did] not decide [r]easonable [a]ccommodations," and directed plaintiff to the website for making an accommodation request. Id. Later that day, plaintiff submitted an accommodation request for "a permanent transfer" to Chaki "effective immediately." [MSPB Record, Dkt. 16-2, at 34–35].

On December 7, 2015, the USPTO denied plaintiff's accommodation request on the ground that "reassign[ment] to a different supervisor is not considered to be a form of reasonable accommodation." Id. The decision explained that plaintiff could always "submit a request for transfer outside of the [accommodation] process." Id. On December 17, 2015, plaintiff requested reconsideration of the decision, submitting documentation that reflected a new diagnosis of post- and continuous- traumatic stress disorder, which he attributed to "physical . . . abuse in [his] childhood," including by "his [d]octoral advisor during his Ph.D. program in 2011–2012," as well as "abusive treatment" by Lo, including "Lo's demeanor, tone, and over-scrutinizing method of correction" of plaintiff's work. Compl. ¶¶ 65–66. On February 4, 2016, the USPTO

7

again denied plaintiff's accommodation request on the same ground, adding as additional explanations for the denial that Chaki worked in a different unit than the unit to which plaintiff was assigned, which meant that plaintiff examined patents of different subject matters, and that plaintiff had never formally worked for Chaki before. Id. ¶¶ 70–72.

In the meantime, plaintiff had continued to submit his work to Lo. See, e.g., id. ¶ 69. On January 14, 2016, Fennema issued plaintiff a notice of a proposed three-day suspension. Id. The notice charged plaintiff with three specifications of improper conduct, including that he had been rude, unprofessional, and insubordinate to Lo on multiple occasions in December 2015 when he had failed to follow Lo's instructions about how to interview patent applicants and had refused to discuss the merits of patent applications in his meetings with Lo. Id. On February 23, 2015, the USPTO found the charges of improper conduct supported, and suspended plaintiff for three days. Id. ¶ 76.

Throughout March 2016, after plaintiff returned from his suspension, numerous incidents occurred in which plaintiff was again alleged to have been rude, unprofessional, and insubordinate in his dealings with Lo. [MSPB Record, Dkt. 16-6, at 10–11]. These incidents included instances, on March 4 and March 7, 2016, respectively, in which plaintiff either failed to attend or refused to participate in afternoon meetings with Lo, and three subsequent instances, on March 15, March 22, and March 24, 2016, respectively, in which Lo scheduled meetings with plaintiff at 10:00 a.m. Id.; see also Compl. ¶ 81. Lo scheduled these morning meetings only after plaintiff either failed to attend or refused to participate in the March 4 and March 7, 2016 afternoon meetings. Compl. ¶¶ 86, 126. Plaintiff alleges that on the dates of these morning meetings, Lo's afternoon schedule was open such that Lo could have scheduled the meetings in the afternoon instead. Id. ¶ 81 Plaintiff attended the morning meetings, but claims he had to

adjust his back pain medication to be sufficiently alert for them, and generally alleges that they

triggered symptoms of his post- and continuous- traumatic stress disorder. See, e.g., id. ¶¶ 78, 81,

87.

The details of these meetings, as well as several other March 2016 incidents, warrant

discussion.[7] On March 1, 2016, plaintiff "did not respond to [Lo's] direction to contact him to

discuss cases when [he] arrived in the office." [MSPB Record, Dkt. 16-6, at 15]. On March 2,

2015, plaintiff again "did not respond to [Lo's] direction to contact him to discuss cases when

[he] arrived in the office." Id. at 15–16. On March 4, 2016, plaintiff "failed to attend" a

"mandatory meeting [with Lo] at 1:00 p.m." Id. at 17. Plaintiff does not dispute that he failed to

attend the meeting, but claims that he "was well within his rights . . . to refuse to follow an

unlawful order." Id. On March 7, 2016, plaintiff again "refused to review his cases with [Lo]

during a scheduled meeting" which took place "at 1:00 p.m." Id. at 18. During the meeting,

plaintiff "refused to discuss [his] cases [with Lo], interrupted [Lo], and recommended that [Lo]

not attempt to meet with him again." Id. at 19.[8] Plaintiff alleges that, following the March 7,

---

[7] The citations to the MSPB record in this paragraph are to the MSPB's decision following plaintiff's appeal of his termination from employment with the USPTO. In each instance that is referenced, plaintiff "conceded" before the MSPB that the conduct took place but asserted either that it was "avoidance behavior consistent with the symptoms of his disability" or that an "affirmative defense" applied, such as failure to accommodate, disability discrimination, or retaliation. [See, e.g., MSPB Record, Dkt. 16-6, at 15]. These MSPB findings are consistent with "the thrust" of the allegations in plaintiff's complaint, and the Court will consider them in resolving defendants' partial motion to dismiss as well as the parties' cross-motions for partial summary judgment. Kerr, 824 F.3d at 72.

[8] The March 7, 2016 meeting is the only meeting about which plaintiff's complaint contains substantial details. Before the meeting, plaintiff requested and was granted a security guard to accompany him to the meeting because he was concerned for his safety, using a service typically reserved for employees walking to their cars at night. Compl. ¶ 85. During the meeting, plaintiff requested a permanent transfer to a different supervisor as an accommodation. Id. Lo did not grant the request. Id. Plaintiff also informed Lo that he had filed a lawsuit in federal district court seeking a permanent transfer to a different supervisor. Id. ¶ 87. Plaintiff requested that all meetings with Lo stop until the lawsuit was resolved because they were detrimental to his health.

2016 meeting, Lo "schedule[ed] and h[eld] mandatory meetings with [him] to occur every

Tuesday and Thursday in the month of March starting on March 8, 2016," at 10:00 a.m. Compl.

¶¶ 86, 126.

On March 15, 2016, during one such morning meeting,[9] plaintiff responded "angrily"

when, despite arriving to the meeting on time, Lo "asked him to come in [to the office] and wait

while [Lo] finished a phone call." [MSPB Record, Dkt 16-6, at 20]. On March 22, 2016, during

another morning meeting, plaintiff "shuffl[ed] papers on [Lo's] desk without consent" in a

manner "which appeared to be intimidating," and "aggressively" told Lo "that [he] did not have

to attend meetings to discuss cases." Id. at 22–23. And on March 24, 2016, during another

morning meeting, plaintiff "refus[ed] to discuss an applicant's invention with [Lo]" and

ultimately "left the meeting without [Lo's] consent." Id. at 24–26.

As a result of this conduct, on May 5, 2016, plaintiff was issued a notice of proposed

removal based on the March 2016 incidents. Compl. ¶ 89. The notice charged plaintiff with 14

specifications of improper conduct, detailed plaintiff's history of disciplinary actions, and

recommended termination of his employment. [MSPB Record, Dkt. 16-1, at 166–75]. On

September 27, 2016, the charges were found to be supported, and plaintiff was terminated

effective September 29, 2016. Compl. ¶ 16.

---

Id. Lo did not grant the request. Id. Plaintiff then reportedly became visibly upset and angry, which made Lo feel concerned for his own safety. Id. ¶¶ 85, 87. Plaintiff left the meeting shortly thereafter. Id. Later that day, plaintiff was temporarily placed on paid administrative leave. Id. ¶ 88.

[9] The citations to the MSPB record in this paragraph are to the MSPB's decision following plaintiff's appeal of his termination. In each instance that is referenced, plaintiff disputed before the MSPB whether some of the conduct took place. [See, e.g., MSPB Record, Dkt. 16-6, at 20]. These MSPB findings are potentially inconsistent with "the thrust" of the allegations in plaintiff's complaint, and despite his incorporation by reference of the entire MSPB record, out of an abundance of caution, the Court will consider them only in resolving the parties' cross-motions for partial summary judgment. Kerr, 824 F.3d at 72.

On October 31, 2016, plaintiff appealed his termination to the MSPB, "alleg[ing] that his removal was due in whole or in part to retaliation, harassment, hostile work environment, discrimination, coercion, [and] intimidation, all on the basis of disability," in violation of multiple federal statutes. Id. ¶ 17. On July 7, 2017, the MSPB sustained 10 of the 14 charges of improper conduct as well as defendants' decision to terminate plaintiff's employment.[10] Id. ¶ 18. In a 34-page decision, the MSPB concluded, in short, that the USPTO "ha[d] proven that [plaintiff] engaged in inappropriate conduct by a preponderance of the evidence," that the USPTO "ha[d] established a nexus between [plaintiff's] misconduct and the efficiency of the service" in that "[plaintiff's] misconduct rendered his supervisor unable to effectively interact with him and manage him," that "the [p]enalty of removal was within the range of possible penalties" for plaintiff's conduct, that plaintiff "ha[d] failed to establish an affirmative defense of discrimination on the basis of disability," including failure to accommodate, retaliation, hostile work environment, or disparate treatment, and that plaintiff "ha[d] failed to establish an affirmative defense of whistleblower retaliation." [MSPB Record, Dkt. 16-6, at 13, 29–30, 40].

On September 11, 2017, plaintiff petitioned the EEOC to review the MSPB's decision only with respect to his discrimination claims. Compl. ¶ 21. On December 5, 2017, the EEOC concurred with the MSPB's decision that the USPTO did not discriminate against plaintiff. Id. ¶ 22. In a 3-page decision, the EEOC concluded, in short, that plaintiff "did not establish that the [USPTO] discriminated against him as alleged," including through failure to accommodate, retaliation, hostile work environment, or disparate treatment. Id.

---

[10] The bases for the four charges of improper conduct which the MSPB did not sustain were not included in the above discussion of the March 2016 incidents.

## B. **Procedural History**

On February 29, 2016, before his termination, plaintiff, who has been <u>pro se</u> throughout

this litigation, filed the first of these consolidated actions as a seven-count complaint against

Michelle Lee, who was then the Director of the USPTO. [Case No. 16-cv-213, Dkt. 1]. The

complaint alleged failure to accommodate, retaliation, hostile work environment, and disability

discrimination under the Rehabilitation Act and the Civil Rights Act. <u>Id.</u> On April 11, 2016,

plaintiff filed a nine-count amended complaint alleging the same. [Case No. 16-cv-213, Dkt. 15].

As plaintiff's termination proceedings began, he also filed several motions for equitable relief,

including a "Motion for a Preliminary Injunction Granting Plaintiff's Reasonable

Accommodation and Staying the Defendant's Dismissal Proceedings of the Plaintiff from the

Federal Service," each of which was denied. [Case No. 16-cv-213, Dkt. 20, 26, 29, 35].

On March 17, 2017, the Court dismissed plaintiff's amended complaint for lack of

jurisdiction because it included claims which had not been administratively exhausted.

Specifically, plaintiff had failed to wait 180 days after amending his initial administrative

complaint before commencing the action, as required by 42 U.S.C. § 2000e-16(c). [Case No. 16-

cv-213, Dkt. 53]. Plaintiff successfully appealed the dismissal.[11]

On January 12, 2018, after his termination and while his appeal to the Fourth Circuit was

pending, plaintiff filed a seven-count complaint against Wilbur Ross, the Secretary of the United

States Department of Commerce, in the United States District Court for the District of Columbia.

[Dkt. 1]. That complaint essentially reasserted the same failure to accommodate, retaliation,

---

[11] The United States Court of Appeals for the Fourth Circuit reversed, holding (1) on a question of first impression, that "the 180-day waiting period" in § 2000e-16(c) "[is] not a jurisdictional rule," and (2) that "the 180-day waiting period" in § 2000e-16(c) "commences with the filing of the initial administrative complaint, regardless of subsequent amendments to that complaint." <u>See generally</u> <u>Stewart v. Iancu</u>, 912 F.3d 693 (4th Cir. 2019).

hostile work environment, and disability discrimination claims which plaintiff had made in this court, as well as claims that the MSPB had committed reversible error in affirming his termination. Id. On October 12, 2018, that action was transferred to this district, and on March 20, 2019, it was consolidated with Case No. 16-cv-213. [Dkt. 25, 31].

On July 5, 2019, plaintiff filed a 21-count consolidated complaint against Michelle Lee and Wilbur Ross, alleging failure to accommodate, retaliation, hostile work environment, and disability discrimination under the Rehabilitation Act, the Civil Rights Act, and the Whistleblower Protection Act, as well as reversible error by the MSPB in affirming his termination. [Dkt. 47]. On August 29, 2019, plaintiff filed a 21-count amended consolidated complaint alleging the same and replacing Michelle Lee with Andre Iancu, who had become the Director of the USPTO [Dkt. 53]. Plaintiff's amended consolidated complaint is the only operative complaint.

Some brief, additional procedural history is necessary to explain plaintiff's response to defendants' dispositive motions. Throughout this litigation, plaintiff has repeatedly missed "standard, reasonable deadlines," even after being granted "multiple deadline extensions." [Dkt. 68]. As relevant here, on September 12, 2019, defendants filed their Motion to Dismiss in Part and Motion for Summary Judgment in Part. Id. Plaintiff was provided the requisite extra time to respond under Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), but twice missed the deadline to respond, offering numerous excuses such as his current enrollment in law school. Id. At one point, plaintiff conceded to defendants that he simply "d[idn't] have anything prepared," despite his amended consolidated complaint largely mirroring his initial consolidated complaint, and despite defendants having previously filed near-identical dispositive motions regarding his initial

consolidated complaint. Id. Nevertheless, the Court ultimately agreed to consider plaintiff's

belated response. [Dkt. 82].

On November 1, 2019, plaintiff filed as his response his Cross-Motion for Summary

Judgment, along with a document styled as a "Memorandum of Law in Support of Plaintiff's

Cross-Motion for Summary Judgment and Response in Opposition to Defendants' Joint Partial

Motion to Dismiss and Partial Motion for Summary Judgment." [Dkt. 69]. This document is split

into two sections. The first section, entitled "Plaintiff's Response to Defendants' Statement of

Undisputed Material Facts," consists of 30 numbered paragraphs indicating the facts relied on by

defendants in their dispositive motions which plaintiff disputes. Id. The second section, entitled

"Plaintiff's List of Undisputed Facts," consists of 3 numbered paragraphs reiterating claims

regarding plaintiff's accommodation requests, followed by handwritten citations to various

attached exhibits.[12]  Id.

---

[12] The weakness of plaintiff's response to defendants' motions is demonstrated by one such
exhibit, an affidavit purportedly written by Gregory Allen Royal, a former USPTO employee
who appears to have interacted with plaintiff, and who appears to have brought racial
discrimination claims against the USPTO in two civil actions before another judge in this
district. [Dkt. 69]. Plaintiff asserts that Royal's affidavit "shows that it is common [for USPTO
employees] to shuffle papers on a supervisor's desk [or] close the door to discuss private
business, and [for the USPTO] to force Black patent examiners out of the patent office based on
false allegations of workplace violence while at the same time allowing unequal treatment of
non-disabled white employees." Id. A cursory examination of Royal's affidavit, which largely
refers to his completely unrelated civil actions in this district, demonstrates its irrelevance to
plaintiff's actions. Royal's affidavit essentially consists of (1) allegations of widespread racial
discrimination by the USPTO, such as its "[p]erpetuation and exploitation of racist stereotypes"
as "an attack tool used to defame and discharge—unlawfully—the African American male patent
examiner," (2) assertions about plaintiff's character, such as plaintiff having "never engaged in
or expressed or made any statements or threats of violence," and (3) baseless and potentially
sanctionable accusations of misconduct by the judge who handled his complaints, such as that
the judge "act[ed] like the biggest child in the sandbox—an abnormally large child—holding a
plastic toy shovel and beating the smallest and weakest child over the head with his shovel." Id.
Plaintiff summarily asserts that "as shown in th[is] affidavit[], . . . Summary Judgment should be
entered for the plaintiff and denied to the defendant[s]." Id. To the contrary, this kind of
irrelevant evidence, including what appears to be an effort to inject a race discrimination element

The document submitted by plaintiff contains no legal argument, and does not respond in any way to any of defendants' arguments in favor of dismissal and summary judgment. Id. District courts have "no obligation to fashion arguments for a party or to further develop a party's argument when it is wholly conclusory, unexplained, and unadorned with citation legal authority." Clayton v. Nationwide Mutual Ins. Co., 260 F. Supp. 3d 514, 521 (D.S.C. 2017). "As a general rule, parties may not outsource their legal resource to the court or otherwise foist upon it the necessary legwork to flesh out a legal claim or defense because, by permitting a party to do so, the court edges into the impermissible advocatory role of argument-creator." Id. In any event, as a courtesy to plaintiff, in evaluating the pending motions. the Court has looked beyond his defective response to defendants' motions and has also considered his amended consolidated complaint, which contains some relevant legal arguments.

## II. DISCUSSION

### A. Standard of Review of MPSB and EEOC Decisions

Because these civil actions deal with matters within the jurisdiction of both the MSPB and the EEOC, they present a "mixed case." In such a case, the district court reviews the plaintiff's discrimination claims de novo as causes of action brought under various anti-discrimination statutes. Rana v. United States, 812 F.2d 887, 888 n.1 (4th Cir. 1987); see also Cousin v. United States, 230 F. Supp. 3d 475, 489 (E.D. Va. 2017). "Although the conclusions of the MSPB and the EEOC regarding discrimination are not entitled to deference, de novo review is not an invitation for the Court to sit as a kind of super-personnel department weighing the prudence of employment decisions." Cousin, 230 F. Supp. 3d at 489–90. "Instead, as in other

---

into this litigation for the first time, supports the Court's ultimate decision to grant defendants' motions.

employment discrimination contexts, the Court's task is to assess the employment decision from the perspective of the employer at the time the decision was made." Id. "Notwithstanding the de novo nature of the district court's review of discrimination claims, the court may consider evidence from the MSPB's formal record." Monk v. Potter, 723 F. Supp. 2d 860, 872 (E.D. Va. 2010).

Plaintiff's non-discrimination claims are reviewed under a more deferential standard and are based on the administrative record before the MSPB. Rana, 812 F.2d at 888 n.1; see also Cousin, 230 F. Supp. 3d at 489. "[T]he decision of the MSPB must be affirmed unless it is found to be: (1) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." Luther, 618 F. Supp. 2d at 494–95. "For the purposes of this analysis, it is important to note that determination of an appropriate penalty [for improper conduct] is a matter committed primarily to the sound discretion of the employing agency. Because of this, reviewing courts will not disturb a penalty unless it exceeds the range of permissible punishment or is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." Id.

Here, emphasizing again that the Court is construing plaintiff's complaint "as best [it] can given the thrust of [his] [allegations]," Kerr, 824 F.3d at 72, plaintiff appears to allege, in Counts I–XX, four types of discrimination claims: failure to accommodate, disability discrimination, and hostile work environment under the Rehabilitation Act, and retaliation under the Rehabilitation Act, the Civil Rights Act, and the Whistleblower Protection Act. Plaintiff also alleges, in Count XXI, one type of non-discrimination claim: reversible error by the MSPB and the EEOC in affirming the USPTO's decision to terminate him. Defendants' Motion to Dismiss in Part is

directed to Counts I–XX, and their Motion for Summary Judgment in Part is directed to Count XXI. It is unclear to which claims plaintiff's Cross-Motion for Summary Judgment is directed; as best the Court can tell, plaintiff appears to seek summary judgment on Counts I, II, IV, and XXI. In reviewing either a plaintiff's discrimination or non-discrimination claims, the district court also reviews them under the standard applicable to the motions before it, Cousin, 230 F. Supp. 3d at 490; see also Luther, 618 F. Supp. 2d at 490; accordingly, a further discussion of the standard of review is included in the subsequent sections, each of which addresses specific motions before the Court.

### B. Defendants' Motion to Dismiss Counts I–XX

#### 1. Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a complaint "must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted." Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). "Therefore, in order for a . . . complaint to survive dismissal for failure to state a claim, the plaintiff must allege facts sufficient to state all of the elements of [his or] her claim." Lucas v. Henrico Cty. Sch. Bd., 822 F. Supp. 2d 589, 600 (E.D. Va. 2011). "Plaintiffs cannot satisfy this standard with complaints containing labels and conclusions or a formulaic recitation of the elements of a cause of action." Id. "Instead, [plaintiffs] must allege facts sufficient to . . . stat[e] a claim that is plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In evaluating a motion to dismiss under Rule 12(b)(6), "a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff." Id.

"In cases where the plaintiff appears pro se, courts do not expect the pro se plaintiff to frame legal issues with the clarity and precision expected from lawyers." Suggs v. M & T Bank,

230 F. Supp. 3d 458, 461 (E.D. Va. 2017). "Accordingly, courts construe pro se complaints liberally." Id. "This principle of construction, however, has its limits." Id. "Courts do not need to discern the unexpressed intent of the plaintiff or to conjure up issues on the plaintiff's behalf." Id.; see also Laber v. Harvey, 438 F.3d 404, 413 n.3 (4th Cir. 2006). These limits are particularly justified where the pro se plaintiff is a lawyer or a law student. See, e.g., Clowdis v. Silverman, 2019 WL 1415454, at *4 (E.D. Va. Mar. 28, 2019); Negron-Bennett v. McCandless, 2013 WL 5552236, at *4 (E.D. Va. Oct. 3, 2013).

### 2. **Analysis**

Each of the four types of discrimination claims which plaintiff appears to allege will be addressed in turn.

#### i. **Failure to Accommodate Under the Rehabilitation Act (Counts I, II, III, IV, V, X, XII)**

Plaintiff alleges seven counts of failure to accommodate under the Rehabilitation Act as follows. Counts I and II focus on defendants' delay in implementing certain granted accommodations. Specifically, Count I alleges that "[o]n [September 19, 2014], [defendants] explicitly granted [plaintiff] the reasonable accommodation[] of a standing desk;" however, that accommodation was "implemented six months later on March 19, 2015." Compl. ¶ 99. Count II alleges that "[o]n [September 19, 2014], [defendants] explicitly granted [plaintiff] the reasonable accommodation[] of a footstool;" however, that accommodation was "implemented on or around June 2, 2015." Id. ¶ 105. Counts III and IV focus on defendants' denial of certain accommodation requests. Specifically, Count III and IV respectively allege that on September 19, 2014, defendants "denied [plaintiff's] reasonable accommodation request" to work "outside of the IFP work schedule," and that "[o]n [February 4, 2016], [defendants] explicitly denied [plaintiff] the reasonable accommodation[] of a transfer and/or a reassignment to work under the

18

supervision of [Chaki]." Id. ¶¶ 111–12, 117. The remaining three counts focus on defendants' failure to abide by an accommodation to which plaintiff claims they had agreed. Specifically, Counts V, X, and XII respectively allege that "[o]n [September 19, 2014], [defendants] explicitly granted [plaintiff] the reasonable accommodation[] to have 1-on-1 meetings with [his] supervisor, when possible, occur after 12:00 [p.m.]," which defendants then "failed to abide by" in "scheduling and holding mandatory meetings with [plaintiff]" at 10:00 a.m. on March 15, March 22, and March 24, 2016. Id. ¶¶ 124, 126, 129, 164, 166, 182, 184.

"To establish a prima facie claim of failure to accommodate under the Rehabilitation Act, a plaintiff must demonstrate that (1) [he or] she was a qualified person with a disability;[13] (2) the employer had notice of the disability; (3) the plaintiff could perform the essential functions of the position with a reasonable accommodation; and (4) the employer nonetheless refused to make the accommodation." Hannah P. v. Coats, 916 F.3d 327, 337 (4th Cir. 2019). Implicit in the third element is a requirement that "[the] proposed accommodation[] [be] reasonable." Reyazuddin v. Montgomery Cty. Md., 789 F.3d 407, 414 (4th Cir. 2015). "Implicit in the fourth element" is a requirement "that the employer and employee engage in an interactive process to identify a reasonable accommodation." Haneke v. Mid-Atlantic Capital Mgmt., 131 F. App'x 399, 400 (4th Cir. 2005). Additionally, a plaintiff "must exhaust administrative remedies before bringing suit under the . . . Rehabilitation Act." Winey v. Mattis, 712 F. App'x 284, 284 (4th Cir. 2018).

Defendants argue that Counts I–III should be dismissed because plaintiff failed to exhaust his administrative remedies by not timely consulting an EEO counselor, and that Counts I and II should also be dismissed because plaintiff failed to allege his good faith participation in the interactive process by conceding that he did not respond to an email from defendants regarding

---

[13] Defendants do not dispute that plaintiff was a qualified person with a disability.

his standing desk and footstool. Plaintiff concedes that he did not timely consult an EEO

counselor, but argues that the time limit should be equitably tolled based on unspecified

misconduct by defendants. He also argues that he had good reasons for not responding to

defendants' email regarding his standing desk and footstool. Defendants have the better

arguments.

The Rehabilitation Act's administrative exhaustion requirement "includes the

requirement [set out in 29 C.F.R. § 1614.105(a)(1)] that federal employees initiate contact with

an [EEO] counselor within 45 days of the date of an alleged discriminatory action." Kirkland v.

Mabus, 206 F. Supp. 3d 1073, 1080 (E.D. Va. 2016). The date of the alleged discriminatory

action is the date "when the [employee] knows, or has reason to know, of such action." Crumps

v. TCoombs & Assocs., LLC, 2015 WL 5601885, at *26 (E.D. Va. Sept. 22, 2015); see also

Stoyanov v. Mabus, 126 F. Supp. 3d 531, 549 (D. Md. 2015). "A plaintiff's failure to timely

consult an EEO counselor requires dismissal of [his] claims for failure to exhaust administrative

remedies." Khoury v. Meserve, 85 F. App'x 960, 960 (4th Cir. 2004); see also Kirkland, 206 F.

Supp. 3d at 1080.

With regard to Counts I and II, concerning plaintiff's EEO complaint about a delay in the

implementation of a standing desk and footstool, he concedes in his complaint that he was fully

aware of the 45-day requirement yet did not timely consult an EEO counselor:

> According to the Department of Commerce's Agency Directive No. DAO 215-10,
> (effective date: 04/24/2013), Section 10, 'Time Frames For Processing Requests
> and Providing Reasonable Accommodations,' it states [that] '[an]
> accommodation, if approved, should be provided within 10 business days of the
> date the request was approved.' Accordingly, on the 11th business day after
> [September 19, 2014], [i.e., on approximately October 3, 2014,] plaintiff should
> have known that [defendants] failed to accommodate him, and would normally
> have 45 days from this date in which to initiate EEO contact (by contacting
> OEEOD) alleging the same.

Compl. ¶ 6 (quoting Department of Commerce Directive DAO 215-10 (2013)) (emphasis added).
It is undisputed that plaintiff first contacted an EEO counselor to complain about the allegedly
discriminatory delay on April 30, 2015, more than six months after the date on which he
concedes he should have known about the delay. Id. ¶ 12.

Even if plaintiff had not conceded in his complaint that he should have known of the
allegedly discriminatory delay as of approximately October 3, 2014, he received actual notice
four days later when, on October 7, 2014, Shirlena Morgan emailed him regarding his standing
desk and footstool and asked him to "[p]lease give [her] a call at [his] convenience to coordinate
[his] accommodation[s]." [Case No. 16-cv-213, Dkt. 11-13]. Plaintiff does not dispute that he
received this email and did not respond to it. Compl. ¶ 198. This email put him on clear notice as
to when any failure to accommodate began. See Stoyanov, 126 F. Supp. 3d at 549 (holding that
the plaintiff should have known of the allegedly discriminatory act based on an email he received
from the defendants).[14]

---

[14] Alternatively, plaintiff's undisputed failure to respond to Morgan's email or otherwise make
any effort to coordinate implementation of his standing desk and footstool for over six months
constitutes failure to allege good faith participation in the interactive process which, as discussed
further below, is a requirement implicit in the fourth element of a failure to accommodate claim.
See, e.g., May v. Roadway Express, Inc., 221 F. Supp. 2d 623, 627–28 (D. Md. 2002) (holding
that the plaintiff's "undisputed and complete failure to respond to [a letter regarding reasonable
accommodations] [was] fatal to his failure to accommodate claim" because he could not show
that he "in good faith, engaged in an interactive process"); cf. Allen v. Baltimore Cty., MD.,
2017 WL 6508930, at *4 (E.D. Va. Dec. 20, 2017) (holding that the plaintiff's failure to respond
to a letter regarding reasonable accommodations was not fatal to his failure to accommodate
claim because the letter was "[f]ar from an olive branch," and "did not ask [him]" to do
anything). Here, plaintiff's failure to allege good faith participation in the interactive process is
underscored by his shifting and utterly implausible explanations for why he did not respond to
Morgan's email. Plaintiff first asserted that he did not respond to the email because it began
"Good afternoon~" and "[his] name is Fenyang Ajamu Stewart and not '~.'" [Case No. 16-cv-
213, Dkt. 11, at 6]. Plaintiff later asserted that he did not respond to the email because it did not
"command[] or instruct" him to do anything, because it was not "clear what [Morgan] was
referring to when she used the word 'accommodation,'" and because he believed it to be "spam

The administrative exhaustion requirement set out in § 1614.105(a)(1) "may be extended in limited circumstances pursuant to federal regulation, or, in rare situations, it may otherwise be equitably tolled." Tharp v. Lynch, 2015 WL 8482747, at *7 (E.D. Va. Dec. 8, 2015). Pursuant to § 1614.105(a)(2), "a plaintiff may be granted an extension when he or she was not aware or notified [of] the time limit, did not know that the alleged discriminatory act occurred, or was prevented from contacting a counselor despite due diligence." Kelly v. McDonald, 2014 WL 5311367, at *3 (E.D. Va. Oct. 16, 2014). "The effect of § 1614.105(a)(1) can also be tolled equitably . . . when the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." Id.; see also Qaiser v. Small Bus. Admin., 2016 WL 8711622, at *6 (E.D. Va. Mar. 18, 2016) ("[A] federal employee may defeat the affirmative defense of administrative exhaustion . . . by proving that [his or] her employer engaged in affirmative misconduct justifying equitable tolling.").

In his complaint, plaintiff appears to invoke equitable tolling.[15] Specifically, the complaint alleges that "[o]n [July 23, 2014], [plaintiff] was chilled from asserting his rights under the Rehabilitation Act" when Wendy Garber engaged in "an alleged act of retaliation for

---

or junk mail or a fishing [sic] scheme that would not require a reply." Plaintiff's Brief in Opposition, at 6. Each of these explanations is belied by the text of the email.

[15] Plaintiff does not argue for a regulatory extension under § 1614.105(a)(2). Even if plaintiff had argued for a regulatory extension, asserting that he was unaware of the time limit, was unaware of the allegedly discriminatory act, or exercised due diligence in attempting to contact a counselor, that argument would fail. As discussed further below, plaintiff concedes that he had prior experience with the accommodation process, and as previously discussed, plaintiff received Morgan's email but did not make any effort to coordinate implementation of his request for a standing desk and footstool for over six months. Compl. ¶¶ 8, 198. As a result, plaintiff would not be entitled to an extension under § 1614.105(a)(2). See, e.g., Kelly, 2014 WL 5311367, at *3 (holding that the plaintiff was not entitled to an extension under § 1614.105(a)(2) because she "previously contacted an EEO counselor about different complaints and had illustrated an understanding of the EEO system," "was provided with notice of" the allegedly discriminatory act, and "ha[d] not identified efforts she undertook" to timely initiate contact with an EEO counselor).

[his] requesting a plain-english reasonable accommodation (to not have to report to work before 10:00 a.m. on a consistent basis)" by "subject[ing] him to a 2-biweek proving ground ritual wherein he was told that [if] after the first bi-week he did not match arbitrary production goals set by [defendants], he would be discharged." Compl. ¶ 8. As a result of this action, plaintiff "was afraid of being punished if he made a request . . . that the [standing desk and footstool] be provided to him in a timely manner." Id. This argument is meritless. As the undisputed timeline shows, plaintiff submitted his request for the standing desk and footstool on July 30, 2014, which was seven days after this alleged instance of retaliation by Garber. [MSPB Record, Dkt. 16-7, at 151–53]. Accordingly, plaintiff's asserted fear is an example of the "unwarranted inferences, unreasonable conclusions, and naked assertions devoid of further factual enhancement" that "are not entitled to the presumption of truth." Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017).

Plaintiff's also makes the inconsistent argument that he timely consulted an EEO counselor with regard to Counts I and II because "the failure of [defendants] to accommodate him constituted a continuing violation of the Rehabilitation Act." Compl. ¶ 7. Specifically, plaintiff alleges that "by initiating EEO contact prior to 45 days [after] the last date of the continuing violation, all [counts within] the continuing violation, from [October 3, 2014 through October 18, 2015], are to be considered timely by the Court." Id. ¶ 8. This argument is also unpersuasive because "[t]he continuing-violation doctrine applies to claims based upon a defendant's ongoing policy or pattern of discrimination rather than discrete acts of discrimination," and "a defendant's failure to accommodate constitutes a discrete act rather than an ongoing omission." Hill v. Hampstead Lester Morton Court Partners LP, 581 F. App'x 178, 181 (4th Cir. 2014). Therefore, "the continuing violation doctrine is inapplicable." Id.; see also

Ze-Ze v. Kaiser Permanente Mid-Atlantic States Regions, Inc., 2011 WL 320945, at *5 (E.D.

Va. Jan. 28, 2011) ("[D]iscrete acts of discrimination cannot be saved by the continuing violation

doctrine, . . . even when they are related to acts alleged in timely filed charges."). Accordingly,

Counts I and II will be dismissed for failure to exhaust administrative remedies and alternatively

for failure to allege good faith participation in the interactive process.

With regard to Count III, concerning plaintiff's EEO complaint about the denial of his

request to work outside of the IFP work schedule, plaintiff's complaint again concedes that he

did not timely consult an EEO counselor. Plaintiff alleges that the denial occurred on September

19, 2014, and that he first contacted an EEO counselor to complain about the denial on April 30,

2015, more than seven months later. Compl. ¶¶ 12, 112. Plaintiff attempts to justify this delay by

claiming that he reasonably interpreted defendants' response to his accommodation request as

"implicitly grant[ing] [him] the reasonable accommodation[] of an [un]orthodox work schedule

outside the bounds of the IFP plan." Id. ¶ 111. Specifically, plaintiff asserts that he "was

prevented by the language in the [September 19, 2014] accommodation decision from knowing

that the USPTO denied his reasonable accommodation, . . . and therefore could not have made

EEO contact within 45 days of the denial to allege . . . a failure to accommodate claim." Id.

¶ 112.

This argument is untenable. In his initial request for an accommodation, plaintiff

explicitly sought not to have to come to work at a certain time. Although the September 19, 2014

decision addressed that request in the "Accommodation Granted" section, it made clear that

plaintiff remained subject to the limitations of the IFP work schedule and was not free to work

whatever hours he chose. The decision stated: "[Plaintiff] is currently on an IFP work schedule,

which should allow him sufficient flexibility in his schedule to work around any difficulties he

encounters with adhering to his typical work schedule. Consistent with the IFP program, [plaintiff] must confer with his supervisor to establish a work schedule that allows him to maximize interaction, training and mentoring with his supervisor." [MSPB Record, Dkt. 16-7, at 151]. Therefore, plaintiff's accommodation request as alleged in his complaint, i.e., for "an [un]orthodox work schedule outside the bounds of the IFP plan," Compl. ¶ 111, was plainly denied, as confirmed by the Fourth Circuit. See Stewart v. Lee, 243 F. Supp. 3d 722, 724 (E.D. Va. 2017) (referring to this request as "explicitly denied"), rev'd on other grounds by Stewart v. Iancu, 912 F.3d 693, 697 (4th Cir. 2019) (explaining that plaintiff remained subject to the limitations of the IFP work schedule). Other excerpts from the USPTO's decision also support this conclusion. For example, in denying plaintiff's request not to have to report his upcoming work schedule to his supervisor, the decision explained: "[Plaintiff] is currently on an IFP schedule, which allows him to adjust his work schedule to meet his needs, as long as he notifies his supervisor when he deviates from his fixed work schedule. The Agency believes that this accommodation is effective in accommodating [plaintiff's] medical condition." [MSPB Record, Dkt. 16-7, at 152]. Accordingly, Count III will be dismissed for failure to exhaust administrative remedies.[16]

Defendants argue that Count IV should be dismissed because plaintiff failed to allege that the accommodation he sought was reasonable. Implicit in the third element of a failure to accommodate claim is a requirement that "[the] proposed accommodation[] [be] reasonable."

---

[16] Even if defendants had granted plaintiff's request to work outside of the IFP work schedule, the record shows that he should have known of any allegedly discriminatory revocation of or refusal to abide by that accommodation more than 45 days before he first contacted an EEO counselor. Specifically, the record shows that, on February 27, 2015, more than two months before he first contacted an EEO counselor, he attended an IFP training session at which he was advised that could not work hours outside of the IFP work schedule. [See MSPB Record, Dkt. 16-1, at 250].

Reyazuddin, 789 F.3d at 414. Count IV alleges that defendants' February 2016 denial of

plaintiff's request to be transferred to work under the supervision of Chaki constituted a failure

to accommodate; however, "the great majority of courts . . . have held that employers are not

required to provide an employee with a different supervisor as an accommodation" because a

different supervisor does not constitute a reasonable accommodation "as a matter of law."

Roberts v. Kaiser Foundation Hosp., 2015 WL 545999, at *7 (E.D. Cal. Feb. 10, 2015)

(collecting cases). Courts in the Eastern District of Virginia adhere to this majority view. See,

e.g., Jordan v. Donahoe, 2013 WL 3893532, at *10 (E.D. Va. July 26, 2013) ("[I]t is

unreasonable as a matter of law for an employee to [request] their being transferred away from a

particular supervisor . . . regardless of whether or not the supervisor is the cause of the

employee's [disability].").

Plaintiff appears to argue, in his complaint, that the Job Accommodation Network, a

Department of Labor-funded "source of free, expert, and confidential guidance on workplace

accommodations and disability employment issues," Burge v. Colvin, 2016 WL 6902118, at *5

n.5 (E.D.N.C. Oct. 24, 2016), has suggested that transfer to a different supervisor can constitute a

reasonable accommodation in certain circumstances. See, e.g., Compl. ¶ 259. This argument is

meritless. The Job Accommodation Network's guidance has been recognized as "non-legal

authority" that is "of limited persuasive value." E.E.O.C. v. Dollar General Corp., 252 F. Supp.

2d 277, 290 n.10 (M.D.N.C. 2003); see also King v. Berryhill, 2018 WL 709968, at *4

(W.D.N.C. Feb. 5, 2018) ("Employers may find it useful to take advantage of the Job

Accommodation Network[,] [but] [the court] do[es] not in any way suggest that employers are

obliged to make use of this service."). Accordingly, Count IV will be dismissed for failure to

state a claim upon which relief can be granted:

Defendants argue that Counts V, X, and XII, concerning defendants' alleged failure in March 2016 to abide by the accommodation to have plaintiff's one-on-one meetings with his supervisor occur, when possible, in the afternoon, should be dismissed because plaintiff failed to allege that he engaged in good faith participation in the interactive process. "[I]mplicit in the fourth element" of a failure to accommodate claim is a requirement that both the employer and the employee "engage in an interactive process to identify a reasonable accommodation." Haneke, 131 F. App'x at 400. "Therefore, even if an employer's duty to engage in the interactive process is triggered," any subsequent liability "may collapse for a number of reasons." Wilson v. Dollar General Corp., 717 F.3d 337, 347 (4th Cir. 2013). One such reason is the employee's failure to participate in good faith in the interactive process. See, e.g., Maubach v. City of Fairfax, 2018 WL 2018552, at *6 (E.D. Va. Apr. 30, 2018); Ruddell v. Triple Canopy, Inc., 2016 WL 4529951, at *10 (E.D. Va. Aug. 29, 2016); see also Boone v. Bd. of Governors of Univ. of N.C., 395 F. Supp. 3d 657, 669 (M.D.N.C. 2019) ("For the interactive process to be effective, it requires bilateral cooperation, open communication, and good faith.").

In this vein, the Fourth Circuit has explained that "courts should look for signs of failure to participate in good faith" in the interactive process and that "neither party should be able to cause a breakdown" in that process. Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 323 (4th Cir. 2011). For example, "[a] party that obstructs or delays the interactive process is not acting in good faith." Id. "In essence," when there has been a breakdown in the interactive process, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." Id. Ultimately, "an employer cannot be held liable . . . where it is the employee who refuses to engage in, or causes the breakdown of, the requisite interactive process." Maubach, 2018 WL 2018552, at *5; see also Allen v. City of Raleigh, 140 F. Supp. 3d 470, 490

(E.D.N.C. 2015) ("An employer's liability for failure to provide a reasonable accommodation ensues only where the employer bears responsibility for the breakdown in such communications.").

Additionally, and significantly, the interactive process is an ongoing process that often continues even after an initial accommodation has been granted. See, e.g., Hannah P., 916 F.3d at 337; Neloms v. Charleston Cty. Sch. Dist., 2019 WL 6092279, at *9–10 (D.S.C. June 19, 2019).[17] As a result, in this and related contexts, courts have considered whether a plaintiff took advantage, or failed to take advantage, of an offered or granted accommodation. See, e.g., E.E.O.C. v. Firestone Fibers & Textiles Co., 515 F.3d 307, 315–16 (4th Cir. 2008); Thompson v. Microsoft Corp., 2020 WL 877821 (W.D. Tex. Jan. 3, 2020) ("Thompson's failure to take advantage of the reasonable accommodation offered effectively terminated the interactive process and is fatal to his claim for failure to accommodate.").[18]

Here, plaintiff's own allegations and concessions before the MSPB, which he incorporated into his complaint, plainly demonstrate that he failed to take advantage of defendants' reasonable offer to let him have one-on-one meetings with his supervisor in the afternoon when possible, and that he therefore bears responsibility for the "breakdown" in the interactive process that ensued. Crabill, 423 F. App'x at 323. Specifically, several of the March 2016 incidents undisputedly involved plaintiff's failure to attend or refusal to participate in meetings with Lo, including multiple afternoon meetings. For example, on March 1, 2016, plaintiff "did not respond to [Lo's] direction to contact him to discuss cases when [he] arrived in

---

[17] See also Dillard v. City of Austin, 837 F.3d 557, 562 (5th Cir. 2016); U.S. E.E.O.C. v. UPS Supply Chain Sols., 620 F.3d 1103, 1111 (9th Cir. 2010).

[18] See also Alejandro v. ST Micro Electronics, Inc., 178 F. Supp. 3d 850, 863 (N.D. Cal. 2016); Caroll v. England, 321 F. Supp. 2d 58, 69 (D.D.C. 2004).

the office." [MSPB Record, Dkt. 16-6, at 15]. On March 2, 2016, plaintiff again "did not respond to [Lo's] direction to contact him to discuss cases when [he] arrived in the office." Id. at 15–16. On March 4, 2016, plaintiff "failed to attend" a "mandatory meeting [with Lo] at 1:00 p.m.," stating that he "was well within his rights . . . to refuse to follow an unlawful order." Id. And on March 7, 2016, during a meeting which took place "at 1:00 p.m.," plaintiff "refused to discuss [his] cases with [Lo], interrupted [Lo], and recommended that [Lo] not attempt to meet with him again." Id. at 18–19. It is only after these incidents that plaintiff alleges Lo "schedule[ed] and h[eld] mandatory meetings with [him] to occur every Tuesday and Thursday in the month of March starting on March 8, 2016," at 10:00 a.m.[19] Compl. ¶¶ 86, 126.

These undisputed facts demonstrate that plaintiff caused the breakdown in the interactive process, and plaintiff does not offer any argument in response. The only potentially responsive argument, again found only within plaintiff's complaint, is that Lo caused the breakdown in the interactive process by declining to grant plaintiff's request, during the March 7, 2016 meeting, for a transfer to work under a different supervisor. See, e.g., Compl. ¶¶ 85–87. As previously discussed, that request was unquestionably unreasonable as a matter of law, and as discussed below, it was also not made in good faith. Accordingly, Counts V, X, and XII will be dismissed for failure to state a claim upon which relief can be granted. See Neloms, 2019 WL 6092279, at *10 ("[T]here are no signs of failure to participate in good faith [in the interactive process] by Defendant and, because [Plaintiff] [terminated the interactive process] while [it] was ongoing, Plaintiff cannot establish that Defendant refused to accommodate her.").

---

[19] Indeed, plaintiff's reported refusal to participate in meetings dates all the way back to December 2015, when such improper conduct was one of the reasons for which plaintiff received a three-day suspension. Compl. ¶ 69.

### 2.   Disability Discrimination Under the Rehabilitation Act (Count VIII)

Count VIII, the only count alleging disability discrimination under the Rehabilitation Act,

alleges that plaintiff "was subjected to disparate treatment discrimination on the basis of

disability" when "Garber refused to transfer [him] to work under [Chaki], upon request as a

reasonable accommodation." Compl. ¶ 150. In support of this claim, plaintiff also alleges that

"[o]n October 30, 2015, [Garber] exhibited invidious animus and intent to discriminate on the

basis of disability when she subjected him to disparaging statements . . . wherein [Garber] used

the phrase 'due to my disability' in a repeated manner in the public space at work." Id. ¶ 149.

This statement purportedly "communicated to co-workers [Garber's] belief that employees who

ask for reasonable accommodations are asking for special treatment that they don't need or

deserve." Id.

"Rehabilitation Act claims for discrimination are reviewed under the McDonnell Douglas

burden-shifting framework." Hannah P., 916 F.3d at 342. "Under that framework, [the plaintiff]

has the burden of establishing a prime facie case of discrimination." Id. "To establish this prima

facie case, [the plaintiff] must show that: (1) [he or] she is disabled; (2) [he or] she was otherwise

qualified for the position; and (3) [he or] she suffered an adverse employment action solely on

the basis of her disability." Id. "If [the plaintiff] establishes a prima facie case, the burden shifts

to [the defendant] to provide a legitimate, non-discriminatory reason for its conduct." Id. "If [the

defendant] provides such a reason, [the plaintiff] bears the ultimate burden of persuasion and

must show by a preponderance of the evidence that the proffered reason was a pretext for

discrimination."[20] Id.

---

[20] Although "a plaintiff does not need to plead a prima facie case to survive a motion to dismiss,"
he or she "is still required to allege facts to satisfy the elements of [the] cause of action." Hayes
v. Md. Transit Admin., 2018 WL 5809681, at *8 (D. Md. Nov. 6, 2018). Accordingly, "in

Defendants argue that Count VIII should be dismissed because plaintiff has not alleged that an adverse employment action was taken against him. Plaintiff offers no argument in response. Defendants' argument is persuasive. "Under the discrimination prong of the Rehabilitation Act, an adverse employment action is one that affects the terms, conditions, or benefits of the plaintiff's employment." Simms v. Hagel, 2015 WL 5020894, at *10 (E.D. Va. Aug. 20, 2015). Accordingly, "[t]his category is limited to serious actions, such as a discharge, demotion, or decrease in pay." Id. Here, the only adverse employment action plaintiff has alleged is the failure to transfer him to work under Chaki, and "[c]ourts have held that . . . denial of a request to transfer to a new supervisor is not an adverse action." Charlot v. Donley, 2014 WL 1319182, at *14 (D.S.C. Mar. 31, 2014) (collecting cases); see also Forgus v. Mattis, 753 F. App'x 150, 153 (4th Cir. 2018); Melendez v. Bd. of Education for Montgomery Cty., 711 F. App'x 685, 688 (4th Cir. 2017). Accordingly, Count VIII will be dismissed for failure to state a claim upon which relief can be granted.

### 3.  Hostile Work Environment Under the Rehabilitation Act (Counts VI, XI)

Counts VI and XI raise duplicative claims under the Rehabilitation Act that plaintiff was subject to a hostile work environment. Specifically, Count VI alleges that "defendants' conduct, via omission and commission, described in Counts I–V," i.e., defendant's alleged failures to accommodate him, "in combination rise to the level of creating a hostile work environment" because they were "unwelcome, intimidating, hostile, and offense." Compl. ¶¶ 135–36. Count XI similarly alleges that "defendants' conduct in Counts I [sic], in view of the [USPTO's] previous

---

reviewing motion to dismiss rulings, the Fourth Circuit continues to speak of a prima facie [case]," which often overlaps with the elements of the cause of action. Johnson v. Lemonds, 2016 WL 447494, at *4 (M.D.N.C. Feb. 4, 2016). As relevant here, that the plaintiff suffered an adverse employment action is both part of a prima facie case and an element of disability discrimination under the Rehabilitation Act. See, e.g., Kirkland, 206 F. Supp. 3d at 1083.

failures to accommodate [him] with a standing desk for six months, . . . created a hostile work environment" because it was "intimidating, hostile, and offensive," and that defendants are "liable for the hostile work environment because they approved [his] reasonable accommodations but failed to provide them, abide by them, nor [sic] provide an alternative accommodation or a last-ditch reassignment during this time." Id. ¶¶ 172–73, 176.

"To prevail on a hostile work environment claim under the Rehabilitation Act, [the plaintiff] must prove that [he or] she: (1) is a qualified individual with a disability; (2) was subject to unwelcome harassment; (3) the harassment was based on [his or] her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition or privilege of employment; and (5) some factual basis for imputing liability to the employer." Edmonson v. Potter, 118 F. App'x 726, 730 (4th Cir. 2004); see also Claiborne v. Youngman, 2020 WL 863977, at *6 (E.D. Va. Feb. 21, 2020). "[The plaintiff] must demonstrate that [the] employer's conduct was objectively hostile, such that a reasonable person would perceive it as such." Edmonson, 118 F. App'x at 730. "Factors to be considered in analyzing the objective component include the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating rather than a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." Id.

Defendants argue that Counts VI and XI should be dismissed because plaintiff has not alleged objectively severe or pervasive conduct. Plaintiff offers no argument in response. Defendants' argument is persuasive. "Plaintiffs must clear a high bar in order to satisfy the objectively severe or pervasive test." Evans v. Int'l Paper Co., 936 F.3d 183, 192 (4th Cir. 2019). For example, "rude treatment from co-workers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's superiors are not actionable." Id.

Similarly, "offhand comments" and "isolated incidents" are not actionable. Id.; see also Chacko v. Patuxent Inst., 429 F.3d 505, 512 n.3 (4th Cir. 2005) ("Hostile work environment claims are different in kind from discrete acts."). Here, it is clear that Counts VI and XI focus on defendants' alleged failures to accommodate plaintiff. Compl. ¶¶ 5, 135–36, 172–73, 176. As previously discussed, "a defendant's failure to accommodate constitutes a discrete act." Hill, 581 F. App'x at 181. As a result, courts have frequently found failures to accommodate, even when accompanied by other allegedly hostile conduct, insufficient to state a hostile work environment claim. See, e.g., McNair v. Spencer, 2018 WL 2147515, at *9 (E.D. Va. May 3, 2018); Shetty v. Hampton Univ., 2014 WL 280448, at *7 (E.D. Va. Jan. 24, 2014); see also Smith v. Strayer Univ. Corp., 79 F. Supp. 3d 591, 603 (E.D. Va. 2015). This case is no different. "Harassment is considered sufficiently severe or pervasive so as to alter the terms or conditions of the employment if a workplace is permeated with discriminatory intimidation, ridicule, and insult." Nnadozie v. ManorCare Health Servs., LLC, 2019 WL 6033796, at *3 (4th Cir. Nov. 14, 2019). Plaintiff's allegations simply do not rise to that level. Accordingly, Counts VI and XI will be dismissed for failure to state a claim upon which relief can be granted.

### 4. Retaliation Under the Civil Rights Act, the Rehabilitation Act, and the Whistleblower Protection Act (Counts VII, IX, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX)

Plaintiff alleges ten counts of retaliation under the Civil Rights Act, the Rehabilitation Act, and the Whistleblower Protection Act, most of which focus on his March 7, 2016 request for a transfer to work under a different supervisor. Count VII alleges that "[o]n or around June 3, 2015, [plaintiff] was subjected to an adverse employment action after he made initial contact with OEEOD [on April 30, 2015], that being the [USPTO] made a finding that his wife [was] not qualified to be considered" for a USPTO job vacancy despite having previously been found

"most qualified" for a "similar" USPTO job vacancy. Compl. ¶ 140. Count IX alleges that "[o]n

March 7, 2016," Lo "sent [plaintiff] a mandatory meeting invite and email that occurred ever[y]

Tuesday and Thursday" at 10:00 a.m., and that "said meetings were in retaliation for [his]

requesting a reasonable accommodation from Lo earlier that day" in the form of "a transfer to

work with or under any [supervisor] besides Lo." Id. ¶¶ 154–56. Counts XIII, XIV, and XV

allege that on March 7, 2016, Lo "scheduled multiple recurring meetings occurring before noon"

after plaintiff earlier that day "request[ed] a reasonable accommodation" in the form of "a

transfer away from Lo." Id. ¶¶ 187–88. Counts XVI, XVII, XVIII, and XIX allege that

defendants "threatened, intimidated, interfered with, and coerced [plaintiff] into forgoing [a]

granted reasonable accommodation" when Lo "scheduled recurring meetings that started at

10:00 a.m. for every Tuesday and Thursday throughout the month of March." ¶¶ 198. Lastly,

Count XX alleges that "[o]n or around May 5, 2016," plaintiff "was issued a notice of proposed

removal" in retaliation for "inform[ing] Lo that he had filed a complaint in federal district court"

during the March 7, 2016 meeting. Id. ¶¶ 202, 204.

Two points are worth addressing at the outset. First, although Counts XVI, XVII, XVIII,

and XIX are brought under 42 U.S.C. § 12203(b), which prohibits "[i]nterference, coercion, or

intimidation," as opposed to 42 U.S.C. § 12203(a), which prohibits "[r]etaliation," numerous

courts have recognized that "the elements are the same" under both provisions. Kerrigan v. Bd.

of Educ. Of Carroll Cty., 2015 WL 4591053, at *5 n.20 (D. Md. July 28, 2015).[21] Therefore,

---

[21] See also Wilson v. Gatson Cty., N.C., 685 F. App'x 193, 201 (4th Cir. 2017); Golden Gate
Transactional Independent Serv., Inc. v. California, 2019 WL 4222452, at *20 n.4 (C.D. Cal.
May 1, 2019); Bayer v. Neiman Marcus Grp., Inc., 2018 WL 2427787, at *7 (N.D. Cal. May 30,
2018); Paul v. Chicago Transit Auth., 2017 WL 1178222, at *3 (N.D. Ill. Mar. 30, 2017); Rose
v. Wayne Cty. Airport Auth., 210 F. Supp. 3d 870, 885 (E.D. Mich. 2016); Berlotti v. Prunty,
2010 WL 3743866, at *3 (S.D.W. Va. Sept. 21, 2010); Luna v. Walgreen Co., 575 F. Supp. 2d
1326, 1342 (S.D. Fla. 2008).

these counts will be analyzed in the same manner as plaintiff's other retaliation claims.[22]

Plaintiff's allegations themselves support this conclusion, as Counts XVI, XVII, XVIII, and XIX

allege that any interference, coercion, or intimidation was in retaliation for his "request[ing] a

reasonable accommodation of a transfer to a previous supervisor." Compl. ¶ 200.

Second, the disposition of plaintiff's retaliation claims under the Whistleblower

Protection Act ("WPA") is particularly straightforward. "[T]he WPA does not provide a remedy

for retaliation for the reporting of federal workplace discrimination." Kennebeck v. Napolitano,

2013 WL 3368960, at *1 (E.D. Va. July 3, 2013); see also Coulibaly v. Merit Sys. Protection

Bd., 709 F. App'x 9, 10 (D.C. Cir. 2017) ("[The WPA] cover[s] employees who make

allegations about general wrongdoing at the agency . . . [b]ut employees who specifically

complain about discrimination against them (or retaliation against them for having filed a

discrimination claim) are not covered by the [WPA] and thus fall outside the [MSPB's]

whistleblower jurisdiction."). Indeed, "the MSPB has repeatedly held that alleged disclosures

that an agency engaged in discrimination and created a hostile work environment" fall outside

the WPA's ambit. Kennebeck, 2013 WL 3368960, at *5 (collecting cases). "This conclusion is

sound, as employees reporting workplace discrimination are protected from retaliation by Title

VII [and other statutes,] and to afford those employees additional protection under the WPA

would render [those] protections superfluous." Id. There is simply "no authority" that "a

complaint of discrimination or retaliation . . . constitutes a protected disclosure under the WPA."

Id.

---

[22] Additionally, although plaintiff references 42 U.S.C. § 12203, which is part of the Americans with Disabilities Act, "[t]he Rehabilitation Act incorporates [§ 12203] by reference." Hockaday v. Brownlee, 370 F. Supp. 3d 416, 424 (E.D. Va. 2004); see also S.B. v. Bd. of Educ. of Harford Cty., 819 F.3d 69, 78 n.6 (4th Cir. 2016).

Here, plaintiff's WPA claims plainly hinge on his complaints of discrimination and

retaliation. For example, plaintiff alleges that he made certain disclosures about "[defendants']

failure to accommodate his disabilities" which "detailed the punishment he was facing [for

them], including increased errors in his work product and abusive and demeaning supervision,

harassment and hostile work environment via lack of reasonable accommodation, and workplace

ridicule by supervisors." Compl. ¶ 187. Plaintiff also alleges that these disclosures "constituted a

contributing factor" in the decision to terminate his employment because various individuals

"could have remedied" the discrimination he faced given that "they had the power to recommend

or transfer him to another department or supervisor to temporarily end the harassment,

discrimination and hostile work environment on the basis of disability." Id. ¶ 195. "[T]he WPA

does not provide a remedy for retaliation for [such] reporting of federal workplace

discrimination." Kennebeck, 2013 WL 3368960, at *1. Accordingly, plaintiff's claims under the

WPA—Counts XIII, XIV, and XV in part, and Count XX in its entirety—will be dismissed for

failure to state a claim upon which relief can be granted.

Turning to plaintiff's remaining retaliation claims under the Civil Rights Act and the

Rehabilitation Act, "[t]o make out a prima facie claim of retaliation [under the Civil Rights Act],

a plaintiff must show: (1) that [he or] she engaged in protected activity, (2) that the employer

took a materially adverse action against [him or] her[,] and (3) there is a causal connection

between the protected activity and the adverse action." Evans v. Int'l Paper Co., 936 F.3d 183,

195 (4th Cir. 2019). Similarly, "[i]n order to establish a prima facie claim of retaliation [under

the Rehabilitation Act], one must demonstrate that (1) plaintiff engaged in protected activity,

such as filing an EEO complaint; (2) the employer took adverse employment action against

plaintiff; and (3) a causal connection existed between the protected activity and the adverse

action." Hoover-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001). Therefore, engagement in protected activity is a necessary element of a retaliation claim under both the Civil Rights Act and the Rehabilitation Act.[23]

Defendants argue that Counts IX, XIII, XIV, XV, XVI, XVII, XVIII, and XIX should be dismissed because plaintiff has failed to allege that he engaged in protected activity, and that Count VII should be dismissed because plaintiff has failed to allege that there was a causal relationship between his protected activity and the adverse action. Plaintiff offers no argument in response. Defendants arguments are persuasive.

With regard to Counts IX, XIII, XIV, XV, XVI, XVII, XVIII, and XIX, plaintiff alleges that he engaged in protected activity during his March 7, 2016 meeting with Lo when he requested to be transferred to work under a different supervisor. "[T]he act of requesting in good faith a reasonable accommodation [constitutes] protected activity." Solomon v. Vilsak, 763 F.3d 1, 15 (D.C. Cir. 2014) (collecting cases from every circuit). Yet plaintiff's own allegations plainly demonstrate that his request was not made in good faith. Plaintiff requested a transfer during his March 7, 2016 meeting with Lo despite having had the same request repeatedly denied over the previous three months. Compl. ¶ 85. The USPTO first denied his request on December 7, 2015 on the ground that "reassign[ment] to a different supervisor is not considered to be a form of reasonable accommodation." [MSPB Record, Dkt. 16-2, at 34–35]. The USPTO again denied his request on February 4, 2016 on the same ground. Compl. ¶¶ 70–72. Plaintiff obviously did not agree with these decisions, but the law is clear that "it is unreasonable as a

---

[23] As relevant here, that the plaintiff engaged in protected activity and that there was a causal connection between that activity and the alleged adverse action are both part of a prima facie case and an element of retaliation under the Civil Rights Act and the Rehabilitation Act. See, e.g., Jones v. Bd. of Educ. of Putnam Cty., 2020 WL 118600, at *5 (S.D.W. Va. Jan. 9, 2020); Jones v. HCA, 16 F. Supp. 3d 622, 634–35 (E.D. Va. 2014); see also supra, note 20.

matter of law for an employee to [request] their being transferred away from a particular supervisor . . . regardless of whether or not the supervisor is the cause of the employee's [disability]." Jordan, 2013 WL 3893532, at *10. Accordingly, Counts IX, XIII, XIV, XV, XVI, XVII, XVIII, and XIX will be dismissed for failure to state a claim upon which relief can be granted.

That leaves only Count VII, which alleges that after plaintiff contacted an EEO counselor on April 30, 2015, the USPTO failed to hire his wife to fill a job vacancy. Compl. ¶ 140. This claim fails because plaintiff has not alleged a causal connection between his contact with the EEO counselor and the decision not to hire his wife. "[N]o causal connection can exist between an employee's protected activity and [a decision-maker's] adverse action if the [decision-maker] was unaware of the activity." Strothers v. City of Laurel, 895 F.3d 317, 336 (4th Cir. 2018); see also McNaught v. Va. Cmty. Coll. Sys., 933 F. Supp. 2d 804, 825 (E.D. Va. 2013) ("The relevant decision-maker's knowledge of a plaintiff's protected activity is crucial to showing a connection to that individual's decision to take the adverse employment action against the plaintiff."). Here, plaintiff has not alleged that whoever decided not to hire his wife was aware of his contact with an EEO counselor. Accordingly, Count VII will be dismissed for failure to state a claim upon which relief can be granted.

### C. **Plaintiff's and Defendants' Cross-Motions for Partial Summary Judgment on Count XXI**

#### 1. **Standard of Review**

Under Federal Rule of Civil Procedure 56, summary judgment "is appropriate when the court . . . finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Heywood v. Va. Peninsula Regional Jail Auth., 217 F. Supp. 3d 896, 899 (E.D. Va. 2016). Accordingly, it is appropriate to grant summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Ford Motor Co. v. Nat'l Indem. Co., 972 F. Supp. 2d 850, 855 (E.D. Va. 2013). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in light most favorable to the nonmoving party." Id.

### 2. Analysis

In Count XXI, plaintiff alleges that the MSPB and the EEOC committed reversible error by affirming defendants' decision to terminate his employment with the USPTO. Although, as previously discussed, plaintiff's Cross-Motion for Summary Judgment contains no legal argument supporting summary judgment in his favor or opposing summary judgment in defendants' favor, his complaint styles Count XXI like an appellate brief, with separate sections purportedly addressing asserted errors in the MSPB and EEOC proceedings. Accordingly, the Court will address those asserted errors.[24]

---

[24] Count XXI makes up 40 pages of plaintiff's complaint. Within Count XXI, plaintiff at times makes one- or two-sentence references to additional errors in the MSPB and EEOC proceedings that are entirely devoid of context or explanation. See, e.g., Compl. ¶ 221 ("Also, because [plaintiff] was charged with workplace violence, in the specifications, the [MSPB] was required as a matter of law to conduct a Metz analysis but failed to do so. Metz v. Dep't of the Treasury, 780 F.2d 1001, 1004 (Fed. Cir. 1986)."). Although "courts do not expect the pro se plaintiff to frame legal issues with the clarity and precision expected from lawyers, . . . [t]his principle has its limits." Suggs, 230 F. Supp. 3d at 461. Additionally, "parties may not outsource their legal resource to the court or otherwise foist upon it the necessary legwork to flesh out a legal claim or defense because, by permitting a party to do so, the court edges into the impermissible advocatory role of argument-creator." Clayton, 260 F. Supp. 3d at 521. Because plaintiff has failed to "sufficiently develop" any of these cursory arguments, none of which appears to be meritorious, either in a proper responsive pleading or in his complaint, they will not be individually addressed. Id.

In the first section of Count XXI, plaintiff alleges that the MSPB assigned "improper weight" to the evidence before it. Specifically, he claims that more weight should have been assigned to his evidence and less weight should have been assigned to the evidence offered by Lo and other USPTO officials. Id. ¶ 217. This argument is unpersuasive because the MSPB's credibility determinations "are virtually unreviewable by this court on appeal." Darvishian v. Geren, 404 F. App'x 822, 832 (4th Cir. 2010); see also Sahadeo v. Dep't of Navy Naval Acquisition Career Ctr., 2015 WL 13047438, at *4 (E.D. Va. Aug. 28, 2015). It is "not [this court's] function as a reviewing court to re-weigh conflicting evidence." Rupert v. Geren, 605 F. Supp. 2d 705, 717 (D. Md. 2009).

In the second section of Count XXI, plaintiff alleges that the MSPB and the EEOC "committed gross procedural and legal [error] when [they] failed to find that the Agency revoked [his] granted reasonable accommodation to have 1-on-1 supervisory meetings occur in the afternoon." Compl. ¶ 224. This section merely reiterates many of plaintiff's discrimination claims which, as previously discussed, will be dismissed; therefore, there is no need to address them again. Significantly, throughout Count XXI, plaintiff does not appear to dispute defendants' argument that substantial evidence supports the MSPB's conclusion that the USPTO proved by a preponderance of the evidence that plaintiff engaged in improper conduct which warranted termination. Indeed, plaintiff conceded before the MSPB that his undisputed conduct "would, under normal circumstances, be deemed misconduct worthy of adverse action." [MSPB Record, Dkt. 16-6, at 39].

To the extent that plaintiff contends the MSPB failed to address his failure to accommodate claim regarding his morning meetings with Lo, that argument is belied by the MSPB's decision. The MSPB concluded that "with regards to the argument that [plaintiff] was

granted a reasonable accommodation which limited meetings to after 12:00 p.m., the accommodation suggested that [plaintiff] and his supervisor [would], when possible, schedule meetings with him after 12:00 p.m." [MSPB Record, Dkt. 16-6, at 39]. The MSPB "[found] the accommodation to be reasonable," and concluded that "the plain language of the accommodation did not excuse [plaintiff] from appearing at all meetings before 12:00 p.m." Id.

In the third section of Count XXI, plaintiff alleges that the MSPB "erred when it found that a lateral transfer to a prior, known supervisor for PTSD disability is not a form of reasonable accommodation." Id. ¶ 249. As previously discussed, this is incorrect. The MSPB correctly concluded that "[plaintiff's] request for a new supervisor was properly denied" on the ground that the MSPB "has long held" that a transfer to a different supervisor does not constitute a reasonable accommodation. [MSPB Record, Dkt. 16-6, at 39].

In the fourth section of Count XXI, plaintiff alleges that his hostile work environment claim was "denied unlawfully due to egregious error, abuse of discretion, [and] misapprehension of the law" because "the agency's conduct, as described in the underlying documents, in combination rise[s] to the level of creating a hostile work environment." Compl. ¶ 262–63. As previously discussed, "[h]arassment is considered sufficiently severe or pervasive so as to alter the terms or conditions of the employment if a workplace is permeated with discriminatory intimidation, ridicule, and insult." Nnadozie, 2019 WL 6033796, at *3. Plaintiff's allegations simply do not rise to that level; accordingly, the MPSB properly concluded that "[plaintiff] ha[d] not established that he was subjected to a hostile work environment" because he "ha[d] not proven by a preponderance of the evidence that [Lo] or any other agency official acted with hostility towards him or harassed him on the basis of a disability." [MSPB Record, Dkt. 16-6, at 34].

Lastly, in the fifth and sixth sections of Count XXI, plaintiff alleges that the MSPB "fail[ed] to rule" on his disability discrimination and retaliation claims. Compl. ¶¶ 271, 276. This argument is belied by the MSPB's decision. The MSPB explained that "[plaintiff] ha[d] not established that discrimination or retaliation was a motivating factor in the decision to remove him," either by direct or circumstantial evidence. [MSPB Record, Dkt. 16-6, at 32–33]. Specifically, the MSPB explained that "[plaintiff's] intervening actions outweigh[ed] any suspicions of discriminatory animus" given that the USPTO "was aware of [plaintiff's] disabilities and EEO activity for a number of years before proposing to remove him," and only proposed to remove him after numerous instances of inappropriate conduct in March 2016. Id. Plaintiff offers no evidence or argument that casts doubt on this conclusion, which the Court finds particularly telling.

At bottom, there is no genuine issue of material fact regarding whether the MSPB or the EEOC committed reversible error in affirming defendants' decision to terminate plaintiff's employment with the USPTO. As previously discussed, "the decision of the MSPB must be affirmed unless it is found to be: (1) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." Luther, 618 F. Supp. 2d at 494–95. Additionally, "determination of an appropriate penalty is a matter committed primarily to the sound discretion of the employing agency" such that "reviewing courts will not disturb a penalty unless it exceeds the range of permissible punishment or is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." Id. A careful review of the MSPB record demonstrates that neither the MSPB nor the EEOC committed reversible error.

## III. CONCLUSION

For the reasons stated above, by an Order to be issued with this Memorandum Opinion, defendants' Motion to Dismiss in Part and Motion for Summary Judgment in part will be granted, plaintiff's Cross-Motion for Summary Judgment will be denied, and judgment will be entered in defendants' favor.

Entered this 17 day of April, 2020.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge